593 S.E.2d 148

**KIAWAH PROPERTY OWNERS GROUP, Appellant,**

v.

**THE PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA, Respondent,**

and Kiawah Island Utility, Inc., Intervenor–Respondent.

No. 25782.

Supreme Court of South Carolina.

Heard Oct. 7, 2003.

Decided Feb. 9, 2004.

234

Michael A. Molony and Lea Kerrison, both of Young, Clement, Rivers and Tisdale, of Charleston, for Appellant.

Fred David Butler, of Columbia, for Respondent S.C. Public Service Commission.

G. Trenholm Walker and Clay B. McCullough, of Pratt–Thomas, Epting and Walker, of Charleston, for Intervenor–Respondent, Kiawah Island Utility Company.

Justice WALLER:

This is an appeal from an order of the Public Service Commission (PSC) approving a rate increase for Respondent, Kiawah Island Utility (Utility). In 1999, this Court reversed and remanded the matter in order for the PSC to set forth sufficient evidentiary detail supporting its conclusions. *Kiawah Prop. Owners Group v. Pub. Serv. Comm'n,* 338 S.C. 92, 525 S.E.2d 863 (1999) (*KPOG I* ). On remand, the PSC af-

firmed its prior holdings. The circuit court affirmed, finding the PSC's order sufficiently complied with this Court's mandate. We affirm.

## FACTS

The pertinent facts are set forth in *KPOG 1*:

Kiawah Island Utility, Inc. (the Utility) provides water and sewer service to the residents of Kiawah Island. The Utility is wholly owned by Kiawah Resort Associates (the Developer). In July of 1996, the Utility applied to the Public Service Commission for an increase in its existing rates and charges for water and sewer service. The appellant, Kiawah Property Owners Group as well as the consumer advocate . . . intervened in opposition to the increase and participated in the Commission's proceedings.

Prior to the 1996 adjudication, the rates and charges of the Utility had been approved by the PSC in 1992. The Utility sought to increase its operating margin by 5.43%. After the hearings, the PSC issued an order granting the Utility an increase of only 3.55%. . . . . The circuit court issued its order upholding the PSC.

338 S.C. at 94, 525 S.E.2d at 864. In *KPOG 1*, we found the PSC had failed to set forth a sufficient evidentiary basis for its determinations.

## ISSUES

1. Does the PSC have jurisdiction over Developer?
2. Did the PSC properly refuse to either rescind land leases between Developer and Utility, or require Developer to donate the land in question to Utility?
3. Did the PSC properly refuse to require Developer to reimburse Utility for expenditures Owners claim were attributable to Developer?
4. Should "building incentive" paid to Developer have been included as revenue to Utility?
5. Did the PSC properly refuse to invalidate the cross-collateral and cross-default provisions of Utility's 1995 loan agreement with NationsBank?

## STANDARD OF REVIEW[1]

 This Court applies a deferential standard in reviewing decisions by the PSC and will affirm those decisions if supported by substantial evidence. *Total Envtl. Solutions, Inc. v. South Carolina Pub. Serv. Comm'n*, 351 S.C. 175, 568 S.E.2d 365 (2002); *Heater of Seabrook, Inc. v. Pub. Serv. Comm'n of South Carolina*, 324 S.C. 56, 478 S.E.2d 826 (1996). We will not substitute our judgment for that of the PSC where there is room for a difference of intelligent opinion. *Id.* The PSC's findings are presumptively correct, requiring the party challenging an order to show the decision is "clearly erroneous in view of the substantial evidence on the whole record." *Id.*

 Normally, the expenses of a Utility are presumed to be reasonable when incurred in good faith. *KPOG I*, 338 S.C. at 95, 525 S.E.2d at 864, *citing Hamm v. South Carolina Pub. Serv. Comm'n*, 309 S.C. 282, 422 S.E.2d 110 (1992). However, when payments are made to an affiliate, a mere showing of actual payment does not establish a prima facie case of reasonableness. *Hilton Head Plantation Utilities, Inc. v. Pub. Serv. Comm'n*, 312 S.C. 448, 451, 441 S.E.2d 321, 323 (1994). The PSC must review and analyze intercompany dealings and determine if they are reasonable; if there is an absence of data and information from which the reasonableness and propriety of the services rendered and the reasonable cost of rendering such services can be ascertained, the allowance is properly refused. *Id.*

### 1. PSC JURISDICTION OVER DEVELOPER

 Owners assert that since Utility is a wholly-owned subsidiary of Developer, Developer should have a) donated numerous items to it (such as fire hydrants, transmission/distribution lines), or b) not have charged Utility for other items (such as management fees), and c) that Developer should be

---

1. As noted by this Court in *KPOG I, supra,* the basis for most of Owners' arguments on appeal is that "due to the Developer's control over the Utility, the Developer entered into deals with the Utility that would result in greater profit to the Developer and higher rates for the Utility's customers. KPOG's position is that no independent utilities would have entered into such deals with a developer because those deals were bad for the Utility and the ratepayers." 338 S.C. at 94, 525 S.E.2d at 864, n. 1.

required to reimburse Utility for any expenses it claims were unreasonable.[2] We agree with the PSC that it simply does not have authority to order the relief requested.

In its order on rehearing, the PSC ruled that since it had jurisdiction only over public **utilities,** it did not have authority to "order an affiliate company to pay back funds to a utility.... The Commission's authority rests solely over public utilities themselves. Therefore, we are limited to granting in whole or in part, or denying proposed adjustments in utility rate cases, based on our view of the evidence ..."

■ The statute conferring authority on the PSC, S.C.Code Ann. § 58–5–210 (1976), states:

The [PSC] is ... vested with power and jurisdiction to supervise and regulate the rates and service of every **public utility** in this State, together with the power, after hearing, to ascertain and fix such just and reasonable standards, classifications, regulations, practices and measurements of service to be furnished, imposed, observed and followed by every public utility in this State and the State hereby asserts its rights to regulate the rates and services of every "public utility" as herein defined.

(Emphasis supplied). Notwithstanding Developer is not a "public utility,"[3] Owners assert PSC does, in fact, have jurisdiction over Developer, pursuant to S.C.Code Ann. § 58–5–20 (1976). Section 58–5–20 provides:

---

**2.** Initially, we agree with the PSC that these costs are not being passed on to the ratepayers. Further, to the extent the PSC found that items were not justified or reasonable, they were excluded from the rate base, such that they do not affect the rates set forth in the order.

**3.** The term "public utility" is defined in S.C.Code Ann. § 58–5–10(3) (1976) to include the following:

every corporation and person delivering natural gas distributed or transported by pipe, and every corporation and person furnishing or supplying in any manner heat (other than by means of electricity), water, sewerage collection, sewerage disposal, and street railway service, or any of them, to the public, or any portion thereof, for compensation; provided, however, that a corporation or person furnishing, supplying, marketing, and/or selling natural gas at the retail level for use as a fuel in self-propelled vehicles shall not be considered a public utility by virtue of the furnishing, supplying, marketing, and/or selling of such natural gas.

Any corporation or person not engaged in business exclusively as a public utility shall be governed by the provisions of Articles 1, 3 and 5 of this chapter in respect only of the public utility owned, leased, operated or managed by it or him and not in respect to any other business or pursuit.

We find § 58–5–20 was simply intended to subject the provider to regulation by the PSC **as a utility with respect to its activities in the provision of utility services;** we do not believe it was intended, as Owners suggest, as authority for PSC to order a separate entity to donate land to its subsidiary, to rescind its land leases, to make payments to the Utility for certain assets, to donate fire hydrants to the utility, etc.

Moreover, we find it is simply unnecessary for PSC to exercise direct jurisdiction over Developer. To the extent a transaction is not done at "arms-length," or is found by the PSC to be unreasonable, it is properly excluded from the rate-base, thereby ensuring that improper or unreasonable transaction costs are not passed on to rate-payers. *See generally* Lee R. Russ, Annotation, *Amount Paid By Public Utility to Affiliate for Goods or Services as Includable in Utility's Rate Base and Operating Expenses in Rate Proceeding,* 16 A.L.R.4th 454 (1982)(recognizing public service commissions may scrutinize transactions between affiliates and adjust operating expenses accordingly). In fact, the PSC did exclude numerous items and amounts in the present case,[4] and granted an increase to Utility's operating margin of only 3.55%, rather than the 5.43% operating margin requested. The PSC properly declined to exercise jurisdiction over Developer.

## 2. LAND LEASES

■ Pursuant to 23 S.C.Code Ann. Regs. § 103–541:

No utility shall execute or enter into any agreement or contract with any person, firm, partnership, or corporation

---

4. For example, Utility sought to include $100,000 in management fees as direct labor costs and overhead; PSC found Utility had not proved that amount, but instead had only justified $36,000 in management fees. PSC also denied Utility's attempt to include $10,836 in rate case expenses (incurred in seeking a rate increase), and $500,000 to plant for the construction of the Eugenia Avenue Sewer Project.

or any agency of the Federal, State or local government which would impact, pertain to, or effect said utility's fitness, willingness, or ability to provide sewer service, including but not limited to the collection or treatment of said sewerage, **without first submitting said contract in form to the Commission and obtaining approval of the Commission.**

(Emphasis supplied). It is undisputed that Utility entered into two land leases with Developer without obtaining prior PSC approval. One of the leases is for a "down island storage facility" used for a one million gallon above ground storage tank for potable water, and the other is land next to Utility's wastewater treatment plant on which Utility built a holding pond for treated effluent. Although the PSC ruled the better practice would be for Utility to have prior approval of the lease agreements, it found the leased property was useful to, and used by, Utility. We agree.

Developer leased the land for the holding pond to Utility for an annual rental of $66,000. PSC approved a $33,000 annual expense for the leased premises for the holding pond. In its order, the PSC cited the testimony of Utility's engineer, Mr. Bohannon, which indicated that Utility needed additional storage capacity for treated effluent to serve the needs of all of its customers. The PSC also cited the testimony of Utility's CEO, Mr. Clarkson, to the effect that alternatives for increasing storage capacity would have cost much more money, that Utility would have had a hard time borrowing sufficient funds from a bank to purchase the property, and that an independent appraisal firm had determined the fair market rental value for the property. Owners do not contest the evidence cited by PSC in support of its decision; they simply contend that an independent utility would not have entered the leases. However, this Court refrains from substituting its judgment for that of the PSC where there is room for a difference of intelligent opinion. *Heater of Seabrook, Inc. v. Pub. Serv. Comm'n of South Carolina, supra.*

■ As noted by the PSC, Owners have at no time challenged the reasonable rental value of the property, nor did they present any evidence that the fair rental value is less than that allotted by PSC. Owners also did not challenge that

an additional holding cell for treated effluent was necessary. Accordingly, as there is evidence supporting PSC's decision that the land leases were both necessary and reasonable, its decision is affirmed.[5]

### 3. UNREASONABLE EXPENDITURES

Owners next assert the trial court should have required Developer to reimburse Utility for numerous expenditures it claims were attributable to Developer rather than Utility. As noted in Issue 1 above, the PSC simply does not have authority to require Developer to reimburse Utility for these items. Accordingly, we need not address the merits of these issues.

Moreover, we find substantial evidence supports the PSC's determination that each of the challenged expenditures was reasonable and attributable to Utility. *Heater of Seabrook, supra.*

### 4. BUILDING INCENTIVE/AVAILABILITY FEES

Owners next assert the PSC erred in failing to attribute "building incentive fees" collected by Developer as a contribution in aid of construction to Utility. We disagree.

In its 1992 Order, Order No. 92–1030, the PSC ruled that "availability fees" collected by Developer[6] did not constitute any type of revenue to the Utility and found they were more appropriately recognized as a contribution in aid of construction, such that rate base was reduced accordingly.

In the present case, Owners argued that the current "building incentive fees" charged by Developer should be treated as a contribution in aid of construction and an adjustment of $530,098 made. The PSC ruled that 1.6 million dollars had

---

5. We are troubled that PSC did not require compliance with its own regulation. However, we acknowledge that the Commission has wide latitude to determine its methodology in rate-setting and there is no abuse of discretion where substantial evidence supports the finding of a just and reasonable rate. *See Heater of Seabrook, Inc. v. Pub. Serv. Comm'n,* 324 S.C. 56, 478 S.E.2d 826 (1996). Given the evidence in support of its decision, we simply cannot say the PSC committed an abuse of discretion.

6. The order recognizes that the "availability fees" are now known as "building incentive" fees.

already been deducted from Utility's rate base in recognition of the previously paid availability fees. It then found that the current "building incentive fees" charged by Developer are not the same as the "availability fees" imposed prior to 1991. The PSC stated, "To encourage construction of houses on the unimproved lots that it sells, the developer ... assesses a building incentive fee against the owners of undeveloped lots. This fee is paid directly to [Developer]. The building incentive fee is entirely different from the availability fees that were once (but no longer) charged by [Developer] for infrastructure that included water and sewer lines."

The PSC relied upon the testimony of Mr. Clarkson, Utility's CEO, that the prior availability fees paid to it had been treated as a contribution in aid of construction as ordered, and that the PSC's auditor had made the same adjustment. Utility also presented proof to the PSC that no availability fees had been collected since 1991, that the Utility did not receive any monies from the building incentive fees currently collected by Developer, and that none of these fees related to Utility's provision of water and sewer service on the island.

Given the abundant evidence that the current "building incentive" fees do not benefit Utility, we find the PSC properly refused to attribute them to Utility. *See Total Envtl. Solutions v. S.C. Pub. Serv. Comm'n*, 351 S.C. 175, 182, 568 S.E.2d 365, 369 (2002)(PSC lacks jurisdiction to regulate availability fees where no evidence exists Utility collected or directly benefited from them).

### 5. CROSS–COLLATERAL/DEFAULT LOAN PROVISIONS

 Finally, Owners challenge certain loan provisions Utility has with NationsBank (now Bank of America).

Utility and Developer had loan agreements with Nations-Bank, and the agreements have as collateral the assets of both Developer and Utility. They also specify that a default by either of the entities constitutes a default by the other. The PSC noted that "[t]he cross-collateralization required by NationsBank has benefited the Utility and has never had a negative effect." *Id.* Owners' reply brief acknowledges this statement is presently true, but contends the loan agreements were

nonetheless commercially unreasonable and may affect Utility's customers **in the future.**

This Court is obligated to inquire in every action whether a justiciable controversy exists in a matter. *Treatment and Care of Luckabaugh,* 351 S.C. 122, 568 S.E.2d 338 (2002); *Byrd v. Irmo High School,* 321 S.C. 426, 468 S.E.2d 861 (1996). "A justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Coop., Inc. v. Carolina Power & Light Co.,* 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983).

Here, it is patent there is no present, justiciable controversy. Owners assert only that the loan provisions may have some negative impact in the future. This is simply insufficient to warrant this Court's review. Accordingly, the PSC's findings are affirmed.

## CONCLUSION

We find the PSC's 2000 order sets forth sufficient evidence on which to conclude its decision is supported by substantial evidence. Accordingly, the PSC's rulings are affirmed.

**AFFIRMED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.